IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| vs. | ) ) | CRIMINAL NO. 13-CR-30025-DRH |
| FREDERICK BATHON, | ) ) ) | |
| Defendant. | ) | |

**GOVERNMENT'S SUPPLEMENTAL MOTION
FOR ORDER REGARDING RESTITUTION**

The Government provides the Court with this second motion for an order, pursuant to 18 U.S.C. §3663(c)(3), 18 U.S.C. §3664(a), 18 U.S.C. §3771(d)(2) and Fed. R. Crim. P. 60, determining that it is impracticable to perform a complete accounting of the losses to each individual victim given the complex issues of fact related to the large number of victims, finding that the Government has exercised its "best efforts" to accord crime victims their right of restitution in the instant case, and ruling that no additional resources need be expended in determining the amount of restitution owed to each of several thousands of victims in the case.

*I. Background*

On February 25, 2013, the Government filed a motion (Doc. 13) requesting the Court to enter an order determining that "(A) [t]he number of identifiable victims is so large as to make restitution impracticable; or (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." *See*, 18 U.S.C. §3663A(c)(3).

On March 1, 2013, the Court denied the Government's first motion, without prejudice, seeking additional details concerning the steps that would be required to calculate individual restitution amounts. The Court was concerned because the current Madison County Treasurer had made public statements indicating that he had the ability to calculate the amount of economic harm that was caused by the Defendant's conduct. (*See*, http://www.stltoday.com/news/local/crime-and-courts/taxsale-scheme-cost-madison-county-property-owners-millions/article_9d90c1d7-d33a-5ec2-ac7f-13406cd79514.html) The Court's Order stated that the current Treasurer should be consulted and his information should be included in a supplemental motion, if the Government chose to file one. This motion follows. The Government renews the arguments made in its original motion (Doc. 13) and states to the Court that an individualized assessment of restitution cannot practicably be made.

## II. Overview

This prosecution follows the investigation of a price fixing scheme that occurred during the Madison County tax sales taking place in calendar years 2005-2008, which enabled tax buyers to purchase tax liens at non-competitive interest rates. By 2007 and 2008, the bid rigging and price fixing was so pervasive that distressed homeowners were charged the statutory maximum interest rate (18%) on nearly every property tax lien sold.

In order to assess the impact of the scheme, the Government examined data from tax sales occurring in years free of collusion (tax years 2002-2003, and 2008-2010) and compared that data to the tax sales that were tainted by collusion (tax years 2004-2007). By assuming that the average interest rates charged during tax sales that occurred free of collusion should have also been charged during the scheme, it can be estimated that distressed homeowners in Madison

County were swindled out of approximately $4 million dollars. That calculation represents excess interest payments that were ultimately collected by tax buyers.

However, it was observed that at every tax sale – even those conducted with competitive bidding – a significant portion of the Madison County tax sales resulted in homeowners being charged the statutory maximum 18% penalty rate. This occurs because tax buyers selectively purchase tax liens based upon a number of subjective variables, such as the location of the property, the state of repair of the structure on the land, the homeowner's payment history, the size of the tax bill, the assessed value of the property, the real estate market where the property is located, along with many other factors. Tax buyers evaluate those risk factors differently, and as a result, many times tax buyers are simply unwilling to purchase certain tax liens unless they receive the highest interest rate. These legitimate economic considerations routinely result in many tax liens being sold for 18%, even during a perfectly lawful tax sale that is conducted free of collusion. As such, the presence of an 18% interest rate alone is not proof of misconduct.

Two things became immediately obvious. First, the scheme generally involved the absence of competition over the penalty interest rate which resulted in almost every homeowner being charged excess interest. Second, however, is the observation that some of those homeowners would have been charged 18% even if the scheme had never existed. But, to order restitution, the Court must identify actual out-of-pocket losses. Therefore, the Government endeavored to distinguish between which individual properties were properly charged 18% and which properties received the maximum rate based on collusion. In addition, the degree to which the interest rate charged on any particular parcel was inflated would also need to be determined.

Very specific data is available from the tax sales. And the data can tell us averages, but it cannot tell us with any level of certainty *which particular properties* experienced inflated tax

bills nor can the data alone tell us what interest rate would have been bid in the absence of the scheme. This determination necessarily would include an evaluation of a number of subjective variables. An expert could make a reasonable judgment on any particular property; however, it is entirely impracticable to retain an expert to review and assess each of the 9,299 parcels for which tax liens were sold during the scheme. For those reasons, it is impracticable to assess restitution in this case.

## III. The Government's Calculations

Prior to filing its motion for an order regarding restitution (Doc. 13) the Government conducted an evaluation of every tax sale occurring in Madison County during the scheme (tax years 2004-2007). A total of 11,762 individual transactions were initially identified and were downloaded into a spreadsheet where the following categories of information were collected and analyzed:

   a. Parcel number
   b. Identity of the tax buyer who purchased the tax lien
   c. Interest rate bid to purchase the property tax lien
   d. Amount of the tax bill sold
   e. Date of the tax sale
   f. Tax year
   g. Township where the parcel was located
   h. Name of the owner of the parcel
   i. Identity of any co-owners of the parcel sold
   j. Street address, city, and zip code of each parcel subject to the tax sale

This data was analyzed and reviewed for each tax year. Additionally, the database was examined according to tax buyer, with respect to each individual and entity associated with the scheme for purposes of determining the scope of the unlawful conduct.

At each tax sale there are a number of tax liens offered for sale which go unsold because those liens are undesirable to investors. Those un-purchased liens are granted to a trustee at the statutory maximum interest rate. Tax liens allocated to the trustee were not considered as part of

the loss analysis because no tax buyers bid on the liens and they were not sold during the auction. After removing the parcels that were unsold and allocated to the trustee, it was determined that a total of 9,299 tax liens were sold to tax buyers during the time period charged in the Information. Of that group, 7,119 were purchased by individuals and entities associated with the scheme.

The Government shared this database with victim/witness staff from the FBI in anticipation of identifying and individually notifying victims. Further, the Government intended to determine restitution, as is customarily done in fraud cases, pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. §3663A(c)(1)(B). The Government intended to use mathematical formulas through its Microsoft Excel database to make individual loss calculations for the purpose of assessing restitution. The Government attempted to determine the degree to which the criminal conduct increased interest rates and then apply that interest rate differential against the value of each victim's tax bill to determine a restitution amount for each individual victim.

In an effort to identify an interest rate differential that could be applied to calculate restitution, the Government obtained and reviewed nine (9) years of data from Madison County tax sales. The data from tax sales that were conducted free of criminal collusion (tax years 2002-2003, and 2008-2010) was compared to the data from the tax years involved in the scheme (tax years 2004-2007). There were 19,002 tax liens sold to tax buyers while 3,166 tax liens were unsold liens and were allocated to the trustee. The unsold liens were not considered further.

The average interest rate charged during the tax sales was evaluated in two separate ways. First, a simple average was determined by dividing the total number of tax sales by the sum of the interest rates actually charged. Second, the Treasurer's weighted average was examined. The

weighted average is a more accurate measure because a simple average considers each tax sale equally, while the weighted average factors the relative value of the tax bill sold. In general terms, there is more competition over valuable tax liens and less competition over smaller tax liens. As such, the interest rate charged on a large tax bill tends to be less than the interest rate charged on a small tax bill. The weighted average considers this dynamic.

For example, consider two tax lien transactions. In the first transaction a $100 tax delinquency is purchased for an 18% penalty rate. In the second transaction, a $1,000 tax lien is purchased for 2%. A simple average of those two transactions results in an average penalty rate of 10%. But that result doesn't accurately explain economic reality because the simple average is limited to an analysis of how many transactions occurred at each interest rate. The simple average does not consider the value of the liens bid at each interest rate. A weighted average, by contrast, considers both variables. In the example cited above, the calculation results in a 3.45% weighted average for the two transactions. This measure more accurately represents the economic reality of our two hypothetical transactions because it considers the relative value of liens sold at each penalty interest rate.

   a. The weighted average of the interest rates charged at Madison County tax sales for years with competition where market interest rates were charged was approximately 3.6%. The simple average of the interest rates for those same years was 4.42%.

   b. The weighted average of the interest rates charged at Madison County tax sales for years during the scheme was approximately 16.7%. The simple average of the interest rates for those same years was 16.8%.

   c. A weighted average interest rate differential of 13.1% was observed when comparing the years during the scheme to years where market forces determined the penalty interest rate.

After determining the average interest rates that were charged in Madison County during the scheme (tax years 2004-2007) compared to years when market rates prevailed (tax years 2002-

2003, and 2008-2010) the Government was able to calculate that approximately $1,767,858 in excess tax penalties were charged at the tax sales. This figure was determined by applying the 13.1% interest rate differential to the volume of commerce attributable to the individuals and entities associated with the scheme.

However, the interest rate differential charged at the tax sale is an incomplete measure for assessing the economic harm caused by the scheme. One must also consider that, pursuant to Illinois law, the penalty interest rate compounds semiannually. The interest rate is a true penalty. The entire amount of penalty interest is due immediately after the tax sale. The same principle applies after the rate compounds - the full amount of compounded interest is immediately due for the compounded term. Alternatively stated, the interest rate is not amortized over each six month redemption period. The following chart demonstrates the impact of compounding interest:



Compounding interest exponentially increases the costs to homeowners who are unable to redeem their delinquent taxes in a timely fashion. This is particularly significant considering that out of the 7,119 tax liens that were purchased by individuals and entities associated with the scheme that 3,361 (47%) of the homeowners who redeemed those liens ultimately paid compounded interest. To quantify the impact of compounding interest, the Government

7

examined payment records to see how much interest was actually paid by homeowners to tax buyers.

The Government focused on individuals and entities associated with the scheme and examined their activity during the scheme (tax years 2004-2007) compared to years when market rates prevailed (tax years 2002-2003, and 2008-2010). The result reflects a dramatic increase in penalty interest charged and collected by those tax buyers during the scheme. The following was observed for those individuals and entities:

|  | **During the Scheme** | **Market Conditions** |
|---|---|---|
| **Tax Years** | 2004, 2005, 2006, 2007 | 2002, 2003, 2008, 2009, 2010 |
| **Total Tax Liens Purchased** | 7119 | 6346 |
| **Value of tax bills purchased** | $13,495,098.00 | $11,626,096.00 |
| **Average penalty interest rate bid at tax sale** | 16.79% | 4.42% |
| **Total interest actually received from homeowners** | $4,846,902.14 | $693,546.48 |
| **Average amount of interest received per tax lien** | $680.84 | $109.29 |
| **Return on investment** | 35.92% | 5.97% |

To calculate how much interest was overcharged by tax buyers during the scheme, the Government took two measures. First, it compared the average amount of interest received per tax lien. Second, it assessed the tax buyer's return on investment as a percentage of their investment.

First, the Government calculated that, on average, tax buyers received $109.29 of interest per lien during years where there was competition. That amount was multiplied against the total number of liens that were purchased by individuals and entities associated with the scheme

8

(7,119 x $109.29). This calculation estimated that in the absence of collusion that $778,035.15 of interest would have been collected for those 7,119 tax liens. However, $4,846,902.14 was actually collected due to the inflated interest rates

> $4,846,902.14 (penalty interest actually collected by tax buyers during the scheme)
> - $ 778,035.15 (the amount that should have been collected / interest per parcel)
> $4,068,871.85 excess interest actually collected

Second, the Government examined the amount of interest received as a percentage of the tax buyer's total investment. This calculation was made by dividing the total amount of interest received from homeowners by the amount of money invested in purchasing the tax liens. In years with competitive bidding, the individuals and entities associated with the scheme actually earned 5.97% on their investment; while during the scheme they pocketed a whopping 35.92%. Had those same individuals and entities collected the market rate of 5.97% during tax years 2004-2007, then they would have collected $805,040.46 interest instead of the nearly $5 million that they actually collected.

> $4,846,902.14 (penalty interest actually collected by tax buyers during the scheme)
> - $ 805,040.46 (the amount that should have been collected / as a % of investment)
> $4,041,861.68 excess interest actually collected

These calculations estimate the economic impact of the crime. The Government endeavored to mathematically allocate that overcharged interest proportionally amongst aggrieved property owners, but that proved to be a task that was not possible under the governing law.

## IV. *Variables Making a Restitution Calculation Impracticable*

The charged conspiracy consists of a continuing agreement, understanding and concert of action to fix prices and rig bids for property tax liens auctioned in Madison County during tax years 2004-2007. At its most basic level, the case simply involves the fact that the property tax sales were corrupted so that tax buyers were permitted to purchase tax liens at the maximum rate

without competing over the interest penalty that was to be charged to distressed homeowners. A portion of the evidence supporting that accusation consists of the results from the auctions themselves:

   a. During the tax auction occurring November 14-15, 2007, 2,549 out of 2,574 property tax liens were awarded to bidders for the statutory maximum interest rate, which represented 99.03% of the property tax liens auctioned.

   b. During the tax auction occurring November 13-14, 2008, 2,290 out of 2,364 property tax liens were awarded to bidders for the statutory maximum interest rate, which represented 96.86% of the property tax liens auctioned.

The Government examined tax sales occurring in years free of collusion (tax years 2002-2003, and 2008-2010). A total of 9,703 tax liens were auctioned during that time and 2,041 of those sales resulted in the winning bidder offering the statutory maximum of 18% penalty interest. As such, even with competitive bidding, 21% of the Madison County tax sales resulted in homeowners being charged with the statutory maximum 18% penalty rate.

These factors make two conclusions unavoidable: First, the scheme generally involved the absence of competition over the penalty interest rate which resulted in many homeowners being charged excess interest. Second, however, is the observation that some of those homeowners would have been charged 18% even if the scheme had never existed. Therefore, the Government began an effort to try to identify which particular homeowners suffered an out-of-pocket loss, for purposes of calculating restitution.

Prior to interviewing current Madison County Treasurer Kurt Prenzler, the Government consulted with two experts in the field of Illinois tax sales. One expert is a former president of the Illinois Treasurers' Association with more than 40 years' experience in the field of Illinois tax sales. The second expert is an individual with more than 30 years' experience in the field of Illinois tax sales who has worked in virtually every county in Illinois. The Government consulted

with both experts about whether a process could be employed to ascertain out-of-pocket loss to each homeowner on an individual level. The Government asked whether it was possible to identify what interest rate would have resulted at the tax sale in the absence of the scheme.

Both experts agreed that it is not possible to calculate an actual out-of-pocket loss at the individual level in this scenario. There are numerous variables that exist to influence the penalty interest rate that tax buyers are willing to accept on individual properties and there is no principled way to mathematically recreate what the interest rate would have been for a particular property in the absence of the scheme. Such a determination would necessarily require an expert to render a subjective evaluation of many variables, such as the location of the property, the state of repair of the structure on the parcel, the homeowner's history of payment, the size of the tax bill, the assessed value of the property, the real estate market where the property is located, along with many other factors. These variables are the reason why certain properties are more desirable to tax buyers and result in different penalty interest rates being charged during competitive auctions.

It is not practicable to have an expert individually review each of the 9,299 tax liens that were sold to tax buyers during the time period charged in the Information in an effort to determine which particular homeowner's tax bills were inflated. Similarly, it is not practicable to determine what the interest rate would have been in the absence of the scheme. The experts agreed that the most accurate way to gauge the loss would be an estimate that compares the average tax rates – as the Government had already done.

## V. *The Government Conferred with the Current Madison County Treasurer*

On March 11, 2013, Madison County Treasurer Kurt Prenzler and Chief Deputy Treasurer Jeremy Plank, CPA, appeared at the United States Attorneys' office and met with the prosecution

team and counsel for the Defendant. They appeared with a comprehensive spreadsheet containing the details for all 22,168 tax sale transactions occurring in tax years 2002-2010. Prenzler obtained an audit of his spreadsheet by an outside CPA firm prior to meeting with the Government to ensure that the mathematical formulas he applied were valid.

The spreadsheet contained mathematical formulas that compared the interest rate bid on each individual parcel against the simple average interest rate charged in the township where the parcel was located for calendar years 2011, 2012, and 2013 – the years Prenzler has administered the tax sale. By assuming that the simple average rate charged for the township during calendar years 2011, 2012, and 2013, should have also been charged for each individual property in that township during the scheme (tax years 2004-2007), Prenzler estimated the average amount of overcharged interest for each individual parcel. He totaled the amount of "overcharged interest" for each parcel to arrive at a cumulative loss amount.

Prenzler's approach is slightly different from the Government's evaluation, but it essentially attempts to capture the same metric: the average amount of overcharged interest. His calculation assumes the time that he has served as treasurer as the baseline for comparison, while the Government also considered tax sales from tax years 2002, 2003 and 2008 in its averages because those auctions involved competitive bidding. Prenzler's calculation relied upon an analysis of the simple average of the interest rates charged at the township level, while the Government's calculations relied upon the weighted average of the auctions at the county level. Despite the modest methodological differences, both the Treasurer and the Government sought to quantify losses to individual distressed homeowners the same way – by comparing the average interest penalty rate charged during competitive auctions against the actual interest rates that were charged during the scheme.

Prenzler's approach is a logical effort to measure the overall financial impact of the scheme. But, simultaneously Mr. Prenzler and the Government both are forced to acknowledge that all such comparisons are inevitably estimates based upon averages. Mr. Prenzler understands that variables do influence the interest rate that is actually bid by tax buyers at the tax sale, but he declined to discuss those factors because he stated that he was not qualified to comment on what those variables would be. He stated that an expert tax buyer would be required to assess the variables that impact a tax buyer's decision on what interest rate to bid. His analysis consisted of comparing the various tax sales to the simple average interest rate charged per township in calendar years 2011, 2012, and 2013.

Prenzler's formula calculated that individual property owners were overcharged a total of $4,403,479.16 during the scheme (tax years 2004-2007). However, this figure assumes that every tax buyer at each auction was a criminal participant in the scheme. By filtering his results to examine only the transactions involving individuals or entities associated with the scheme, his formula produced an estimate that the overcharged interest totals $3,576,073.65. As discussed in Section II., *supra,* the Government estimated the overcharged interest at either $4,068,871.85 or $4,041,861.68, depending on the methodology employed. While no one can identify the total cost of the scheme with precision, it is clear that, on average, distressed homeowners in Madison County lost close to $4 million dollars as a result of this scheme.

Prenzler's formula is a helpful tool in evaluating the scope of the scheme because it can average and estimate loss at the township level. However, if that same formula is applied to tax sales that were not tainted by collusion, it continues to produce calculations that identify "overcharged interest." Indeed, if the formula was applied to Prenzler's own auctions it would calculate and identify parcels where there was "overcharged interest." This is true

notwithstanding the fact that Prenzler has unquestionably run a tax sale that is free from collusion or corruption. This leads to the obvious question: why would the formula identify and calculate overcharged interest for auctions that were free of collusion?

The answer is that the formula is simply calculating the degree to which the interest charged on any particular parcel varies from the township average for calendar years 2011, 2012, and 2013. Those township averages are useful, but obviously the desirability of property within any given township can vary greatly. For example, one would expect the charged interest rate on tax liens for properties in Nameoki Township to be subject to wide fluctuations as that township includes property close to very different cities, including: Collinsville, Madison, Fairmont City, Pontoon Beach, and Granite City. Simply put, not all properties in Nameoki Township – or any other township for that matter – are created equal.

An analysis of the interest rate differential is a useful tool in identifying the overall economic impact of the crime. However, it is simply not possible to reconstruct what the penalty interest rate would have been for any particular property during the scheme without considering the subjective factors that go into determining the market value of a property at the tax sale. An examination of the interest rate, along with other subjective factors would be required to determine whether the interest rate charged on any particular property was the product of collusion or the product of market forces – or some combination thereof. This could only be done with an individualized review of each particular parcel with the assistance of an expert.

## VI. *Applying these Calculations to the Law*

The Mandatory Victims Restitution Act of 1996 ("MVRA") requires that district courts make orders of restitution in cases in which an identifiable victim or victims has suffered a pecuniary

loss. 18 U.S.C. §3663A(c)(1)(B). Restitution is to be ordered in the full amount of the victim's losses. 18 U.S.C.A. § 3613(a). United States v. Lee, 659 F.3d 619, 621 (7th Cir. 2011).

Calculating loss to assess restitution is different than determining loss for the purpose of applying the US Sentencing Guidelines. Determining loss, pursuant to the Guidelines, is a flexible process that can rely upon intended loss, reasonable estimates of loss, or alternative measures, such as the gain that resulted from the offense. U.S.S.G. §2B1.1 (cmt. n.3). The MVRA, by contrast, provides that the court shall order restitution to each individual victim in the full amount of each victim's losses. 18 U.S.C. § 3664(f)(1)(A). This process requires proof of the actual out-of-pocket loss to each individual victim because of the defendant's conduct. United States v. Havens, 424 F.3d 535, 538 (7th Cir. 2005).

A restitution order based upon an estimate was reversed in United States v. Caputo, 517 F.3d 935, 943 (7th Cir. 2008). In that case, the defendant fraudulently sold medical devices that were unapproved by the Food and Drug Administration (FDA). The district court calculated the loss amount and restitution award to be $17 million, which represented the list price of all the devices that the company delivered. Defendant appealed, complaining that he had not been given credit for the fact that some devices had been sold at a discount and others had been given away as promotional items. The Court upheld the Guideline computation but reversed the restitution award, stating "Finding actual transactions prices was unnecessary to know the "loss" for the purpose of §2B1.1, which does not require more than an estimate. Restitution, by contrast, requires an exact figure …" Caputo, 517 F.3d 935, 943. The Court explained that restitution for a machine with a "list price of $100,000 but sold at a $20,000 discount is $80,000, not $100,000. And the restitution for a machine given away as a demonstrator is nothing. Likewise restitution for a machine that was invoiced at $100,000, but never paid for in light of the recall (defendants

say that there were several in this category), is zero. The district court must determine these figures one customer at a time and not use the list-price shortcut that is suitable when the only question is whether loss falls within widely spaced bounds." Caputo, 517 F.3d 935, 943.

The Seventh Circuit similarly reversed a restitution order in United States v. Webber, 536 F.3d 584 (7th Cir. 2008), for a defendant's conviction of making false statements to obtain federal employees' compensation benefits, where $62,226.36, representing the total amount of benefits received, was ordered, rather than the actual loss to the government, which was the difference between the amount of benefits that she actually was paid and the amount of benefits to which the defendant would have been entitled absent the fraud. The Court explained that an order of restitution that exceeds the victim's actual losses or damages is an illegal sentence.

In United States v. Shepard, 269 F.3d 884 (7th Cir. 2001), the Court vacated and remanded a restitution order for a defendant convicted of depleting the savings of an elderly woman after the defendant gained her trust and was allowed to move into her home. The defendant drained $92,000 from the victim's bank account on the pretext of using the money for home maintenance and improvements. The Court noted that restitution is limited to actual loss, plus any applicable interest since the money was taken from an interest bearing account. Additionally, the Court stated that the total amount of restitution should be offset by the value of any actual improvements made to the victim's home. Shepard, 269 F.3d 884, 888.

These cases make clear that an award of restitution must be predicated upon a victim's actual out-of-pocket loss. In this case, that determination cannot reasonably be made. While it is true that a hugely disproportionate number of tax liens were sold for 18% during the scheme, it is equally true that many of those parcels would have sold for 18% even with competitive bidding.

As set forth more fully in Section III., *supra*, in years free of collusion when market rates prevailed (tax years 2002-2003, and 2008-2010) 21% of all parcels were sold for the maximum statutory interest rate. During Mr. Prenzler's term of office for which there is data available – tax years 2009 and 2010 – the incidents of tax buyers obtaining a parcel for the statutory maximum interest rate have declined; nevertheless, the maximum rate was charged in 281 out of 3,021 tax sales that were auctioned during Mr. Prenzler's tenure as treasurer, which represents 9.3% of all the tax liens sold. There are legitimate market-based reasons why investors might not be willing to accept a tax lien for a lesser rate, such as the location of the property in poverty stricken area, a dilapidated structure on the property, the homeowner's ability to redeem the lien may be in question due to a history of delinquency, etc. Once it is recognized that 18% bids are a naturally occurring event at tax sales, then the job of ordering restitution becomes infinitely more complicated. At that point, one must discern between which individual properties were properly charged 18% and which properties received the maximum rate based on collusion. In addition, the degree to which any particular parcel was inflated would need to be determined.

The data can tell us averages, but it cannot tell us with any level of certainty *which particular properties* experienced inflated tax bills nor can the data alone tell us what interest rate would have been bid in the absence of the scheme.

Each property owner whose delinquent tax bill was sold was going to be required to pay something in order to redeem the tax lien. The Government can assess the general economic impact of the crime, but is entirely unable to calculate what interest rate each particular property owner would have been required to pay in the absence of the scheme. The actual rate that would have been charged is dependent upon a number of subjective variables. An expert could make a reasonable judgment on any particular property; however, it is entirely impracticable to retain an

17

expert to review and assess each of the 9,299 parcels whose tax liens were sold during the scheme.

After interviewing Mr. Prenzler, the Government continues to be confident in its position that a complete accounting of each victim's losses is not practicable due to the complex issues of fact related to the large number of victims. Mr. Prenzler's loss calculation followed the same general methodology that the Government attempted to utilize. His findings are largely consistent with the Government's independent calculations. However, the statistical averages calculated by the Government and Mr. Prenzler are insufficient as a matter of law to support an order of restitution.

## VII. *Conclusion*

The Government's motion asking the Court to dispense with further proceedings related to restitution is not made lightly. The Government understands and deeply respects its obligations to protect the rights of crime victims. But it must be said that this position is not based upon its failure to make calculations. By contrast, the Government went to great lengths to analyze the data *prior* to moving the Court to excuse a further determination of restitution in its original motion (Doc. 13). Similarly, the Government's position is not based upon it wanting to "take the easy way out" and avoid complex work, as was baselessly asserted in one media account. (See, http://www.bnd.com/2013/03/05/2520998/public-deserves-full-accounting.html) A tremendous amount of work has gone into the investigation and evaluation of the evidence in this case. The Government's position is based, as it is in all cases, upon the application of the facts to the governing case law.

The law requires an individualized assessment of actual out-of-pocket losses prior to ordering restitution. In this case, that determination would require an expert to examine the tax data, along

with a number of subjective variables that inevitably impact the market value of a tax lien, prior to determining what the actual interest rate would have been assessed for each particular property in the absence of the price fixing scheme. This cannot practicably be done. Such a process would complicate and prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process. 18 U.S.C. §3663A(c)(3).

A complete accounting of each victim's losses is not practicable due to the complex issues of fact related to the large number of victims. In addition, the Government has exercised its "best efforts" to accord crime victims their rights and no additional resources should be expended in determining restitution for each of the thousands of victims in the case.

Respectfully submitted,

UNITED STATES OF AMERICA,

STEPHEN R. WIGGINTON
United States Attorney

/s/ Steven D. Weinhoeft
STEVEN D. WEINHOEFT
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, Illinois 62208
(618) 628-3700 telephone
(618) 628-3720 facsimile
E-mail: Steven.Weinhoeft@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 13-CR-30025-DRH |
| | ) | |
| FREDERICK BATHON, | ) | |
| | ) | |
| Defendant. | ) | |

**Certificate of Service**

I hereby certify that on April 22, 2013, I caused to be electronically filed the **GOVERNMENT'S SUPPLMENETAL MOTION FOR ORDER REGARDING RESTITUTION** with the Clerk of Court using the CM/ECF system which will send notification to all attorneys of record.

I hereby certify that on April 22, 2013, I caused to be mailed by United States Postal Service, the document(s) to the following non-registered participants: NONE

Respectfully submitted,

UNITED STATES OF AMERICA,

STEPHEN R. WIGGINTON
United States Attorney

*/s/ Steven D. Weinhoeft*
STEVEN D. WEINHOEFT
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, Illinois 62208
(618) 628-3700 telephone
(618) 628-3720 facsimile
E-mail: Steven.Weinhoeft@usdoj.gov